UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 14-137-DLB-CJS

CHARLES E. MILLER                                                    PLAINTIFF

vs.                          MEMORANDUM OPINION AND ORDER

GEOFFREY S. MEARNS, et al.                                   DEFENDANTS

**************************

This is a § 1983 action brought by Plaintiff Charles E. Miller ("Miller") against Northern Kentucky University ("NKU" or the "University") and three of its employees, both individually and in their official capacities. Miller alleges violations of his right to procedural due process based on the manner in which NKU terminated his employment. He also brings a state law claim for breach of contract. The Court has original jurisdiction over the § 1983 claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a).

I.     **Factual and Procedural Background**

       1.     *The Parties*

       NKU is a state university of the Commonwealth of Kentucky. (Doc. # 5 at 2, ¶ 2). At all times relevant to this matter, Defendant Gregory S. Mearns ("Mearns") was NKU's President; Defendant Kenneth R. Ramey ("Ramey") was NKU's Vice President of Administration and Finance; and Defendant Lori Southwood ("Southwood") was NKU's Senior Director of Human Resources (Mearns, Ramey, Southwood and NKU referred to

1

collectively as "Defendants").  (*Id.* at 2, ¶¶ 3-5).

Miller is a former employee of NKU.  (*Id.* at 1-2, ¶ 1).  He was hired in December 2007 as the general manager of the University radio station, "WNKU."  (*Id.* at 2, ¶ 1).  The complaint does not allege that Miller agreed to work for a defined period of time, nor does it assert that he and the University executed an employment contract at the time he was hired.  (*See* Doc. # 5).

### 2.    Miller's Termination

On January 13, 2014, Miller received a letter from Ramey stating that his employment was being terminated, effective February 10, 2014.  (*Id.* at 5, ¶ 29).  In the letter, Ramey explained that "[t]he continued decline in the financial performance of the station, coupled with my careful evaluation of the entire enterprise has unfortunately brought me to the decision that the station needs a new direction and change in leadership."  (Doc. # 5-2 at 1).  Miller was placed on paid administrative leave until his last day of employment, which came and went without incident.  (*Id.*)

Shortly thereafter, Miller filed a grievance with NKU concerning his dismissal.  (*Id.* at 5, ¶ 36).  He met with the grievance committee on February 26, 2014, and met with President Mearns three weeks later.  (*Id.* at 5, ¶ 37).  Miller was not satisfied with the manner in which either of these meetings was conducted.  He contends that Southwood denied his request to have legal counsel present at both meetings.  (*Id.* at 6, ¶¶ 39-40).  He also asserts that he was given no opportunity to cross-examine adverse witnesses, and had no chance to address the evidence against him because "he was not presented with such evidence with any specificity, either prior to the meeting or at the meeting itself."  (*Id.* at 6, ¶¶ 42-44).  Regardless, by letter dated March 27, 2014, Mearns informed Miller that

his grievance was denied and that the decision to terminate his employment would be affirmed.  (Doc. # 5-3).

### 3. NKU's Employment Policies

When Miller learned of his pending termination, NKU had in place a series of employment policies that were published on the University's website.  (Doc. # 5 at 2, ¶ 8). Relevant to this case are the policies governing termination, discipline and the filing of grievances.

Termination Policies

Section C 7.2 governs involuntary termination, stating as follows:

> If any staff member's performance of duty or personal conduct is unsatisfactory because of failure, neglect or unwilllingness to perform assigned duties, appropriate action with regard to involuntary separation from the university will be taken.  Unless immediate discharge is warranted, appropriate discipline procedures will be followed before an employee is terminated.  Depending upon the facts of the individual case, separation from employment may be initiated for any of the following reasons.

(Doc. # 5-1 at 1).  The reasons referred to in the last sentence of Section C 7.2 include "inefficiency" and "misconduct," which are covered in Sections C 7.3 and C 7.4, respectively.  (*Id.*)  An inefficient employee is one who demonstrates an "inability to perform his job in a satisfactory manner, is excessively absent from the job without adequate justification or exhibits lack of interest, carelessness or other traits resulting in failing to meet the standards of the position."  (*Id.*)  Except in unusual circumstances, an employee who is inefficient and has completed the probationary period will be given at least two weeks notice prior to dismissal.  (*Id.*)  Misconduct, on the other hand, can lead to immediate discharge without advance notice or additional pay.  (*Id.*)  Actions that qualify as misconduct include dishonesty, drunkenness during working hours, destructive

3

negligence and falsification of records.  (*Id.*)

Discipline Policies

Section G 2.1 states that "[t]he following discipline procedures will apply unless immediate discharge is warranted. (See Section C 7.4).  In the case of immediate discharge, the supervisor must have prior approval by the major department head and the Director of the Human Resources Department."  (*Id.* at 2).  Sections G 2.2 through G 2.5 then set out a progressive disciplinary system, in which employees not subject to immediate discharge would first receive a verbal or written reprimand, depending on the seriousness of the violation.  (*Id.*)  If suspension or dismissal becomes necessary, Section G 2.5 apprises the employee of his right to file a grievance.  (*Id.*)

Grievance Policies

Grievances can be filed for "suspensions, demotions, dismissals, denials of promotion, inaccessibility to promotion or claims of illegal discrimination."  (*Id.*)  Sections G 3.1 through G 3.20 explain how a non-faculty employee would go about filing a grievance.  In general terms, he would first attempt to resolve the grievance through his supervisory chain of command.  (*Id.* at 4-5)  If that is not possible, he would bring his grievance to the Director of Human Resources, who would organize a grievance review committee to investigate the matter, accumulate and study the facts, and conduct all hearings.  (*Id.* at 5)  The committee would then forward its written recommendation to the President of NKU, who would issue a final decision.  (*Id.*)

### 4.    *Miller's Lawsuit*

Miller filed the instant lawsuit on July 23, 2014.  (Doc. # 1).  He brings two claims pursuant to 42 U.S.C. § 1983, alleging that he was deprived of his constitutional right to

4

procedural due process before and after NKU chose to terminate his employment. (Doc. # 5 at 7-9). These claims are charged against NKU, as well as Mearns, Ramey and Southwood, both individually and in their official capacities. (*Id.*) Miller brings a third cause of action for breach of contract under Kentucky law, alleging that his termination violated several aspects of the University's employment policies. (*Id.* at 9-10). This claim is brought solely against NKU. (*Id.*) The complaint seeks compensatory and punitive damages and "injunctive relief prohibiting the further and continued violation of [Miller's] constitutional rights." (*Id.*)

## II.     Analysis

### 1.     *Standard of Review*

Defendants' Motion to Dismiss presents matters outside the pleadings for the Court's consideration. (Doc. # 10). Specifically, the Motion is accompanied by certain sections from NKU's employment policies that Miller did not reference in his complaint. (Doc. # 10-2).[1] In such situations, the Federal Rules of Civil Procedure require that a motion to dismiss be construed as a motion for summary judgment. Fed. R. Civ. P. 12(d). Therefore, the Court will look to Fed. R. Civ. P. 56(a) in evaluating Defendants' Motion.

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded. *Anderson v. Liberty Lobby,*

---

[1] Defendants attach Sections A-1.1 and A-1.2, which, respectively, define the purpose of the University's employment policies and establish that they can be modified by the President of NKU with approval from the Board of Regents. (Doc. # 10-2). The significance of these sections is discussed below.

*Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

### 2.  *Section 1983 Claims*

Pursuant to 42 U.S.C. § 1983:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

Section 1983 aims to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).  The statute "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotations omitted).

To state a claim under § 1983, a plaintiff must establish the following two elements: (1) the defendant acted under color of state law; and (2) the defendant's conduct deprived the plaintiff of rights secured under federal law.  *Handy-Clay v. City of Memphis, Tenn.*, 695

6

F.3d 531, 539 (6th Cir. 2012).  As to the first element, the parties agree that NKU is a state actor and that Defendants Mearns, Ramey and Southwood were acting under the color of state law in their dealings with Miller.  (*See* Doc. # 10-1 at 3).  With regard to the second element, Miller contends that Defendants violated his right to procedural due process, as provided under the Fourteenth Amendment to the United States Constitution.  (Doc. # 5 at 7-9).

An alleged violation of procedural due process also calls for a two-step analysis. First, the court must decide "whether a protected property or liberty interest exists." *Johnston-Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir. 1990).  Second, it must determine "what procedures are [constitutionally] required to protect that interest."  *Id.* Courts will proceed to the second step only if a plaintiff can demonstrate a protectable property interest under step one.  *See Litz v. Univ. of Kentucky*, Case No.11-164, 2013 WL 2257697, at *7 (E.D. Ky. May 22, 2013) ("[t]he second step – determining 'what process is due' – is relevant only if Litz can first establish a constitutionally protected interest in his continued employment with the University." (citing *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005))).

Initially, the Court must decide if Miller's expectation of continued employment qualifies as a protectable property interest.  The Sixth Circuit has held that "an at-will employee 'is subject to dismissal at any time and without cause' and, thus, has no protectable interest in her continued employment."  *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 547 (6th Cir. 2012) (citing *Bailey v. Floyd Cnty. Bd. of Educ. By & Through Towler*, 106 F.3d 135, 141 (6th Cir. 1997)).  Conversely, "public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure

7

and cannot be fired without due process." *Gilbert v. Homar*, 520 U.S. 924, 928-29 (1997); *see also Roth Bd. of Regents v. Roth*, 408 U.S. 564, 576-77 (1972). Thus, Miller's claim depends on whether he was an at will employee of NKU, or could be terminated only for just cause.

Entitlement to a property interest is determined by reference to state law. *Roth*, 408 U.S. at 577; *Ludwig v. Bd. of Trustees*, 123 F.3d 404, 409 (6th Cir.1997). Property interests can derive from a "a state statute, a formal contract, or a contract implied from the circumstances." *Ludwig*, 123 F.3d at 409. Although Miller does not allege to have executed a formal contract with NKU, he submits that one exists based on the employment policies published to the University's website. (*See* Doc. # 5 at 2-3, ¶ 10, 13). Because of those policies, Miller explains, "he could only be terminated for certain reasons, and only after the University followed the 'appropriate discipline procedures.'" (Doc. # 5 at 3, ¶ 20). Miller also notes that "it was possible for an employee's termination to be reversed if the grievance committee, and ultimately the President of the University, found that the termination was not justified . . . ." (*Id.* at 4, ¶ 20). Such policies establish that he was terminable only for good cause; and therefore, his expectation of continued employment qualifies as a protectable property interest – or so the argument goes.

A.    *"At will" employment under Kentucky law.*

There is ample Kentucky authority to guide the Court in assessing Miller's theory of relief. The key principles are outlined in *Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489 (Ky. 1983). In that case, the plaintiff's employment contract required that he serve a ninety-day probationary period, during which time he could be discharged for any reason whatsoever, but after which he could only be terminated for good cause. *Id.* at 491. The

8

plaintiff alleged that he was fired without cause after the probationary period had expired, and therefore brought suit against the employer for breach of contract. *Id.* at 490.

In evaluating his claim, the court reiterated that employment for an indefinite period is, by default, terminable at will. *Id.* at 491. However, it also found that parties are free to contract around this presumption. *Id.* at 492. "We join a number of other jurisdictions which hold that parties may enter into a contract of employment terminable only pursuant to its express terms – as "for cause" – by *clearly stating their intention* to do so . . . ." *Id.* (emphasis added). The court explained that the plaintiff's duration of employment will depend on "the understanding of the parties as ascertained by inference from their written or oral negotiations and agreements, the use of business, the situation and objectives of the parties, the nature of the employment, and all circumstances surrounding the transaction." *Id.* at 490.[2]

Applying these rules, the court emphasized that the plaintiff had resigned from a lucrative position in order to work for the employer, and had specifically alleged that his decision was motivated, at least in part, by the for-cause provision that would take effect once the probationary period ended. *Id.* at 491. The court also noted that both parties were highly sophisticated, and found it unlikely that they would draft such a provision without intending to be bound by it. *Id.* Based on this evidence, the court decided there were unresolved questions of fact as to whether the plaintiff could be discharged at will, or only for cause. *Id.* at 492. Thus, it reversed the trial court's grant of summary judgment

_____

[2] Although *Shah* essentially imposed an "all facts and circumstances" test for deciding whether a plaintiff is terminable only for cause, Kentucky courts "have not shied away from resolving due process issues surrounding employment terminations on summary judgment." *Baker v. Kentucky State Univ.*, 45 F. App'x 328, 331 (6th Cir. 2002).

in favor of the employer.  *Id.*

Employment at will is also discussed in *Nork v. Fetter Printing Co.*, 738 S.W.2d 824 (Ky. Ct. App. 1987).  *Nork* is similar to the case at hand in that the plaintiff asked the court to recognize a policies manual "as evidence of a contract of employment, with its terms, and specifically those relating to discharge, as binding upon the employer and employee." *Id.* at 826.  Relying on *Shah*, the court declined to do so.  *Id.* at 827.  The plaintiff was presumed to be terminable at will, and the manual did not evince a "clear intention" to alter the employment relationship.  *Id.*  In support, the court emphasized a disclaimer which stated that the manual was not an employment contract; was only supposed to "guide" the employment relationship; and could be revised, in whole or in part, at any time and without notice.  *Id.* at 826.  The disclaimer also explicitly stated that employment could be terminated at will by either party.  *Id.*

The Sixth Circuit put the above principles to use in *Bailey*, another case with facts that are highly similar to the instant matter.  There, the plaintiff served as director of a federally funded "Head Start" program in Floyd County, Kentucky.  *Bailey*, 106 F.3d at 138. The program was subject to oversight from the Floyd County Board of Education (the "Board"), which adopted  a manual with rules and procedures for addressing personnel matters.  *Id.* at 138-39.  The manual contained a "general policy against discharging employees, except 'for cause.'" *Id.* at 142.  It also established an appeals process resembling NKU's disciplinary and grievance procedures.  *Id.* at 139.  The plaintiff was eventually terminated for various improprieties, and thereafter filed suit against the Board and others for alleged violations of her right to procedural due process.  *Id.*

One of the key issues on appeal was whether the plaintiff had a protectable property

10

interest based on the personnel manual adopted by the Board.  *Id.* at 140-44.  The Sixth

Circuit conceded that the "for-cause" language, coupled with the absence of a disclaimer

in the manual, "perhaps [sent] a conflicting signal to the Head Start program's otherwise

at-will employees."  *Id.* at 142.  However, such facts did not prove dispositive.  *Id.*  Under

Kentucky law, the court explained, the terms of an employment contract are determined

from all of the circumstances surrounding the transaction.  *Id.*  (citing *Shah*, 655 S.W.2d at

490).  The court searched for evidence that the parties had intended for the manual to

impact the plaintiff's employment relationship with Head Start, but found none.  *Id.*

"Whereas the policies at issue in *Shah* formed the basis of that plaintiff's bargain with his

employer . . . there is no indication that Floyd County's policies induced [the plaintiff] to

accept or retain her position as Head Start Director."  *Id.* at 142-43.  Indeed, there was no

indication that the manual was even in place when the plaintiff was first hired.  *Id.*

The court also emphasized the manual's introductory statement, which referred to

the policies within as a "guide and reference," and a collection of "ideas and principles."

*Id.* at 143.  The court found that such language was insufficient to demonstrate that the

manual had been adopted for the purpose of altering the plaintiff's employment status.  *Id.*

For these reasons, it affirmed the district court's grant of summary judgment in favor of the

employer.  *Id.* at 146.

B.     *Miller's employment was terminable at will.*

Based on the case law above, Miller is presumed to have been an employee at will

because he was hired for an indefinite period of time.  *Shah*, 655 S.W.2d at 491.  To

overcome this presumption, he must show a genuine issue of fact as to whether the

policies in question were clearly intended to make his employment terminable only for

cause. *Id; see also Breeden v. HCA Physician Servs., Inc.*, 834 F.Supp. 2d 616, 619 (W.D. Ky. 2011) ("In Kentucky, in the absence of a clear and specific agreement to the contrary, employment for an indefinite period of time is terminable at will by either party."). In deciding whether he has made this showing, the Court will look to the particular circumstances of the case, including such factors as the parties' negotiations and agreements, their respective situations and objectives, and the nature of Miller's employment. *Shah*, 655 S.W.2d at 490.

The parties' negotiations and objectives strongly favor summary judgment. Unlike the facts in *Shah*, there is absolutely no indication that the University's employment policies played a role in Miller's decision to work for NKU. Miller does not allege that the policies induced him to accept his position, nor does he state that he and NKU discussed them at any point throughout the hiring process. In fact, similar to *Bailey*, the Court has seen no evidence that the polices were even in place as of December 2007.

If the policies were implemented after Miller started at NKU, it is conceivable that the parties would have expressed their intent to alter his employment status at that time. But Miller has pled no such theory, and if he had, his own statements would severely contradict it. Miller freely admits that he did not know of his ability to file a grievance until *after* he received Ramey's termination letter. (*See* Plaintiff's Response, Doc. # 14 at 10, n. 2) ("[Miller] was not even told in Ramey's letter that he could file a grievance over the decision to fire. His employment ended before he figured out – on this own – that he had that right, and proceed to do so."). In light of this admission, one cannot reasonably infer that Miller was aware of these policies before January 2013, let alone that he intended for them to govern his employment while at NKU. The Court wonders how it can be expected to find

a protectable property interest in policies which Miller apparently read for the first time in conjunction with the filing of this lawsuit?  The simple answer is that it cannot.

Miller's argument that he was terminable only for cause is based primarily on the policies' language.  (Doc. # 14 at 4-8).  He observes that Sections 7.2 through 7.4 identify several performance-related reasons for which an employee can be discharged, and he emphasizes that nowhere throughout those sections is NKU permitted to fire an employee at will.  (*Id.*)  However, the Sixth Circuit has held that language is not dispositive.  As noted above, the manual in *Bailey* explicitly prohibited terminating an employee except "for cause," and yet the court still found that the parties had not clearly intended to alter their otherwise at will relationship.  NKU's policies are much less compelling.  Section 7.2, which governs involuntary termination, merely states that "separation from employment may be initiated for any of the following reasons [referring to inefficiency and misconduct]."  (Doc. # 5-1 at 1).  It does not provide that these are the only reasons for which an employee can be fired, and it does not state that an employee can be fired only "for cause."  (*Id.*)  Considering the parties' objectives and negotiations, such language does not overcome the strong presumption that Miller's employment was terminable at will.

The Court will draw one more comparison to *Bailey* that supports granting Defendants' Motion.  Similar to the introductory statement contained in the Floyd County personnel manual, NKU's policies include a section which defines their purpose.  (Doc. # 10-2 at 1).  In pertinent part, Section A-1.1 reads as follows: "These Policies and Procedures are designed to establish equity and uniformity in all working conditions, rights, privileges, obligations, benefits, promotion, pay, discipline and all other employment matters.  These Policies and Procedures will *guide* all departmental policies and employees

13

are to be *acquainted* with these *guides*." (*Id.*) (emphasis added).  If there was ever a place for NKU to declare that its employment policies would serve as a binding contract between the University and non-teaching personnel, this would be it.  The fact that it chose not to contradicts Miller's theory of relief.  *See Bailey*, 106 F.3d at 143; *see also Baker v. Kentucky State Univ.*, 45 F. App'x 328, 331 (6th Cir. 2002) (noting that the employee manual did not "purport to be a contract" as evidence that Baker had failed to show "that 'the parties specifically manifest[ed] their intention to condition' the renewal of [his] contract on some standard other than the parties' discretion.").

Finally, the Court observes that Section A-1.2, entitled "Changes and Exceptions," provides that "[t]he President of Northern Kentucky University with the approval of the Board of Regents may makes changes and exceptions to these Policies and Procedures." (Doc. # 10-2 at 1).  Though not as compelling as the disclaimer in *Nork*, this section certainly cuts against any argument that NKU had manifested a clear intent to alter the employment status of its non-teaching personnel.[3]

For the reasons discussed above, Miller was an employee at will.  He did not have a protectable property interest in his employment at NKU and his procedural due process

---

[3] Miller contends that Section A-1.2 is irrelevant because "the policies that governed Plaintiff's employment were <u>not</u> in fact changed by the President and the Board during the relevant time period."  (Doc. # 14 at 5) (emphasis in original).  In support, he relies on *Parts Depot, Inc. v. Beiswenger*, 170 S.W.3d 354, 363 (Ky. 2005), wherein the court held that "once an employer establishes an express personnel policy, and the employees continues to work while the policy remains in effect, the policy is deemed an implied contract for so long as it remains in effect."  Plaintiff's argument is beside the point.  *Parts Depot* did not concern at will employment, and it certainly did not overrule *Shah* or *Nork*; in fact, the court distinguished *Nork* precisely because the personnel policy in that case contained a disclaimer with precatory language.  *Id.* at 363-64.  Thus, in resolving whether NKU clearly intended for Miller to be terminable only for cause, the Court is free to consider all circumstances, including the implications of the disclaimer contained in Section A-1.2.  *See Nork*, 738 S.W.2d at 826; *Bailey*, 106 F.3d at 138; *Norris v. Filson Care Home Ltd.*, Case No. 89-CA-0599, 1990 WL 393903, at *3 (Ky. Ct. App. Jan. 26, 1990).

claims fail as a result.  Therefore, the Court need not address whether Miller was afforded adequate process based on the manner of his termination.  *See Bailey*, 106 F.3d at 141 ("[a]bsent a property interest in her position, however, [plaintiff] was not entitled to any pre-deprivation process whatsoever.").

### 3.     Breach of Contract Claim

Miller also asserts a breach of contract claim arising under Kentucky state law. However, under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction.  If the federal claims are dismissed before trial, the state claims generally should be dismissed as well."  *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir.2009) (quoting *Wojnicz v. Davis*, 80 F. App'x 382, 384-85 (6th Cir.2003)) (internal quotations omitted); *see, e.g., Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210 (6th Cir.2004); *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir.1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.").

The Court's jurisdiction over Miller's breach of contract claim is supplemental under 28 U.S.C. § 1367(a).  Having chosen to dismiss his federal claims at this early stage of litigation, the Court will decline to exercise supplemental jurisdiction over his state law claim pursuant to § 1367(c)(3).

## III.   Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     Defendants' construed Motion for Summary Judgment (Doc. # 10) be, and

15

is hereby, **granted in full**; and

      (2)     A Judgment shall be entered contemporaneously herewith.

This 23rd day of April, 2015.



Signed By:

David L. Bunning

United States District Judge

G:\DATA\Opinions\Covington\2014\14-137 MOO granting MSJ.wpd